The next case today, number 241458, John Doe v. University of Massachusetts et al. Will counsel for the appellant please introduce yourself on the record to begin. Good morning. If it pleases the court, my name is Ilya Fyoktostov. I am counsel for the appellant, John Doe. If it pleases the court, may I have three minutes for rebuttal? You may. Thank you, Your Honor. So, this is a free speech case of the particular type of content restrictions. It's a content-based case. There's no issue of time, place, manner. And content restriction cases should be better thought of as not free speech cases, but restricted speech cases. It's a menu of categories of speech that we restrict either based on situs or categorically from First Amendment protections. You can think of it as a sort of as a menu deck. I have one right here. So, you can pick and choose from among these things. You know, this could be fraud, this could be defamation. But you have to choose one. And during the disciplinary process against my client, the University of Massachusetts chose lewd and offensive speech. And it fits. It fits perfectly in the sense of the allegations against my client. Now, my client denies most of them, but in the sense of the allegations, they fit. A lot of the speech was sex-related. I think the term was related to sex that was offensive to others. The problem is, is that such speech is only forbidden in the K through 12 context under Beth-El versus Frazier. There is a firewall that protects this speech in the university context. These are well-known cases, Papish and Gay Students Organization of New Hampshire v. Boner in this circuit. There's also several others in other circuits as well, especially Dijon and the Third Circuit. Now, during trial, the University of Massachusetts added several more categories. And I think I have them in my reply brief as hexagon is the Tinker disruption, the Tinker forecasted disruption, and the Tinker right of others standard. And then they also added several cases under the Hazelwood standard of school-sponsored speech. The problem with all of that, even if this post-hoc argument is allowed, is that the kind of speech and expressive conduct that my client engaged in just doesn't fit any of these categories whatsoever. It doesn't fit the disruption and forecasted disruption categories because under gay students of New Hampshire v. Boner, sexual conduct, expressive conduct, and speech is allowed as long as it doesn't rise to avert sexual activity. Only then does it become disruptive in a college context, according to that case. The rights of others prong is inapplicable because of the ruling in Brown v. Hot, Sexy, and Safer Products, in which case, under a variety of theories, including Title IX and other theories, common law theories, all sorts of different ways that these high school students try to prove. And I'm going to keep my comments PG here, try to prove that the very, very lewd and disgusting stuff that was said to them in a school lesson did not violate their rights because there's no right to be offended. Let me interrupt you for a little bit. I think I understand what you're saying. This doesn't really fit into many of the cases that we have, but you agree we have to apply a framework to analyze whether free speech issues were at issue here. And do you see tinker as the guiding force for us? Yes. Yes, tinker is the guiding force. Again... Can I skip to just a separate question?  And I'm thinking here about substantial disruption. Assume that I agree with you that your client's comments were just sex-related and not targeted towards a specific individual, such that they would constitute a sexual advance. Okay? So assume I agree with you on that. In terms of the substantial disruption component here, does the number of complainants involved figure into that analysis? And how should I think about that? For instance, if there were, instead of 4, 10, would that figure into the calculus of substantial disruption? The issue with the substantial disruption calculus is that none of these complainants, over the course of a year of alleged activity, made any complaints or exhibited any signs or symptoms of disruption. There's nothing on the record that their grades suffered, that they lost money due to a loss of employment, anything like that. And I'm not trying to minimize any offense or anything like that, but there was no record of disruption until the day after my client caught them drinking. And I guess it would depend on how many people who complained were at that party. The record is unclear. At least one of the original complainants was. But this was a serious offense that they were engaged in. And it just seems remarkably strange that this wasn't ever addressed by either the court below or the police. So Tinker is the, I mean, if the post hoc argument, it's kind of a paradox. I made a post hoc argument at trial. I'm making a post hoc argument right now that I didn't make a trial. And they made a post hoc argument at trial that they didn't make during that. So even if Tinker applies as the framework, again, the framework is here. The facts don't apply to the framework. Could you clarify the chronology? It wasn't clear from the briefs. Some of the complainants at some point found themselves in his room or his living quarters looking at his exercise equipment. When did that occur in relationship to the other alleged events? I believe that occurred in February of that year with the drinking party that occurred on May 6th. And the complaints happened on May 7th. But how about the events that were the subject of the complaints? When did they, in what order did they occur? Over the course of an entire year, I am not sure the order. I think the very first one was the conversation in the kitchen over cooking food. But they all occurred at various times throughout the year, the preceding year. Does the record indicate whether any of the complainants about events or comments other than that occurred in his room looking at the exercise equipment, that any of those events occurred prior to a complainant finding herself in that room? I don't believe so. Maybe, you know, because. In other words, is anyone complaining about a comment that was made to them before they then went to his room? I understand, Your Honor. See, the problem is that each complainant really made a complaint about one incident. So, there's no record of, I mean, the complainant who claims that there is a record of her giving, in here, giving my client a Valentine's Day card, that's in the record. It's in the investigator's report. Yes, and the chronology of that wasn't clear in relationship to the event that that complainant was complaining about. So, right around the same time, February, Valentine's, I don't know. It was around the same time. All of this occurred, again, over the course of an alleged year. Each complainant, except one, claimed one single event. One of them didn't complain, but just claimed to be a witness, the kitchen person. And, in general, the whole thing is vague. I mean, there's not a lot of times. There's not a lot of details. Just in terms of the exercise equipment incident, did your client contest below, or does he contest here, that he touched JT's feet at all when she was using the exercise equipment? Only with his foot. So, foot-to-foot contact. Okay. He does not contest that. He claims he was directing her feet onto where they should go. So. Do you agree that the discipline panel form here sets out that all parties agree that this was the context that the statements were set in? For instance, there's a statement and then a broader acceptance of what the context was. The context is hard to understand sometimes from the report. But I think the investigative report does set broader context. So, in one incident, they were, you know, for the First Amendment, especially the situs is important. This isn't like they were in the classroom. Most of the reported complaints were in the plaintiff's own room. So, the right to be left alone in my client's room is kind of a strange argument. I think one was in the kitchen and then the one about food and sex and the one about I do not need anyone to have sex with was in a work environment. Thank you, Your Honors. Thank you, Counsel. Thank you. Well, Attorney for Appelese, please come up and introduce yourself on the record to begin. Good morning, Your Honors. May it please the court. I'm Michael Hoven with the University of Massachusetts Office of the General Counsel. With me at counsel table and on the brief is Julia Lowe, also from the Office of General Counsel. This court should affirm the judgment of the district court below for three reasons. The district court correctly applied tinker and given the appropriate deference to the decisions of school administrators. Correctly found that one, the Appelese reasonably concluded Doe's behavior caused a substantial disruption. Appelese reasonably forecast that Doe's behavior would cause substantial disruption. And the Appelese reasonably concluded that Doe's behavior invaded the rights of other students. What is your best evidence that Doe's conduct created a substantial disruption? Specifically, is there any evidence of a disruption in classroom activity or a student's ability to participate in school? There isn't evidence of a classroom disruption. The disruption occurred in the dorm room environment where these students live and work. Three of them, one of them left the room when he made his comment. That was SK. He made the comment, I think Doe phrased it as, I don't need someone to have sex with. SK heard something and reported something considerably more graphic. And three of these students would not, asked not to be on a shift with Doe. They did not want to work with him. An initial complainant, EH, who was not heard by the hearing panel, also reported that this was, it was, she tried to avoid Doe, but it was difficult because they're on staff together. And this, while it's not in the classroom, being an RA, this is part of their student life. You know, campus life, universal life does not exist only in the classroom. So this is on campus. It's a role they perform as students. So that's the substantial disruption. Okay, so let me sum that up there. One person left a room. Another didn't want to be on a shift. And another tried to avoid, but was having a hard time trying to avoid. Three of them requested not to be on shifts. That's SK, CT, and JT. All experienced this. Is there any evidence that they were placed on shifts together? Or that there was any effect on the actual working conduct after this incident? Do we have any of that in the evidence in the record? That after these incidents, they were subsequently placed on a shift together and it disrupted them? No, we don't see that. We see them requesting not to be on a shift with him. It's not clear from the record whether that was accommodated prior to him being suspended. Or prior to having those duties suspended. He was not suspended from the university. He was merely removed from housing. But that's the effect it had. And it's also the pattern of disruption that the hearing panel saw. This was, I think your honor said it wouldn't make a difference if there were four or ten complainants. There were four initial complainants. Then another complainant added later SK. And then there's the witness GD. So we have six people coming forward reporting this improper behavior by John Doe. So the hearing panel, hearing from three of the complainants and the witness GD, heard them describe how it affected them. Describe how it impacted their ability to perform their jobs. They found that credible. And they also saw this pattern of behavior that led to a variety of complaints from a variety of different individuals, all being part of this pattern of what they found was sexual misconduct. The fact that there was this activity that we're calling a disruption, that isn't dispositive, is it? Let me give you an example. Suppose he had said to four of them that he liked having sex. And the four of them reacted adversely to that, announced it was an unwelcome comment and they didn't want to work with him. You wouldn't be justified with you and then punishing him as a university, would you, for that? Simply because there was a disruption. Well, I think the substantial disruption is the test. Now whether that would violate a university policy. Doesn't it have to be reasonably, isn't there some objective aspect to what caused it? I mean, suppose he said, I'm new to town. I hope to meet some of you. And they said, that offends us.  You wouldn't prevail. No, we would have to. So you've got to show that his comments rose to a certain level, that a certain type of disruption would at least be reasonable or foreseeable. Well, if we're talking about the reasonable foreseeability of disruption, yes, the hearing panel would have to hear these facts, hear what happened and predict, make that forecast that it would cause a disruption, that it could reasonably forecast a disruption based on those comments. And here they had evidence that there was a disruption. Well, but now you're back to the fact there was a disruption. Don't you need to focus, based on what you just said, on whether the disruption was foreseeably caused by the comments? Not simply that it occurred, but that the comments rose to a level that we would expect the disruption to occur. Yes, if the decision was based solely on a reasonable forecast of disruption, there has to be, you have to think the comments are such that they would cause a disruption. And that's, these comments are a bit more than, I like having sex. It's, I don't need someone to have sex with, I'll just jerk off and go to bed. Sure, but suppose they just decided, based on that, that this guy's pretty weird, we don't want to be around him. Does that get him thrown out of the university? Well, nothing here did get him thrown out of the university, it was removed from housing. But the test under Tinker is, is there a substantial disruption? You could have a very well-meaning, empathetic, political statement that someone delivers. If it's substantially disruptive, the university can regulate that speech. So it is the disruption. It's not the intent of the speaker, it's does this cause a disruption at the university, or can it be reasonably forecast to cause a disruption in the specific environment at the school? You know, some of the school speech cases are students wearing t-shirts that they think have a political message. That's passive speech. It may be, may be informed by deeply held sincere beliefs. So you think if a grad student wears a t-shirt like the one in Tinker that the university could suspend the grad student's privileges? You know, Tinker lets you take into account the specifics of the school environment. A graduate student wearing a t-shirt may be different than a high school student or an elementary school student. But that's where we then end up with, that's quite a different case. Here the grad student is a 36-year-old PhD student, not wearing a t-shirt, making sexual comments to the 21 and 22-year-old RAs that he works with. And to several of them, such that they all come together and they get reports from a variety of people, and it all fits this pattern of behavior. So a t-shirt being worn at a university, that doesn't seem likely to cause a substantial disruption. But I think your position is if it did, then he would lose. Under Tinker, it's the disruptive element. It's not the substance and the content of the message. But the edge case you're talking about is quite a bit different than the facts we have here. So when it comes to the reasonable forecast, not about the actual disruption, a reasonable forecast of disruption certainly would have to take into account those facts. Is this a message that is likely to cause disruption? And the hearing panel, I think, reasonably found that these comments are of a type, and this behavior is of a pattern, that it's likely to cause disruption in this dormitory environment where these students work and live. Is it correct that the panel relied on all of the incidents cumulatively, such that if any one of them was improperly relied upon, there would need to be a reconsideration? I think they're relying on the pattern, but I don't know that if you remove any one incident, that you have taken away the pattern of behavior that they've seen. Well, that's the point. We don't know, do we? No. I mean, they did not allocate a weight to the specific incidents. They took a holistic view. They found the pattern of behavior had caused an actual disruption, was going to cause a disruption unless they removed all of the incidents. They removed him from this dormitory environment, and they also found that it invaded the rights of these students to be, let alone to pursue their education and their job as student RAs. So I think on any of those three, I mean, those are three independently sufficient bases, but they did look at the pattern of behavior. But if you pull incidents out of the pattern, at some point, the pattern of behavior changes. Yes, Your Honor, you're correct. If none of them hold- Maybe it's pulling one item out, maybe it's pulling three or four or five. How do we know? I think what this court would do if it decided one example needed to be pulled out of the pattern is to say, could the university even exclude that? Is it reasonable? For the school to regulate that kind of speech? Because that's the test. It's not a retrial of the disciplinary case. It's, did the hearing panel reasonably conclude that there was a disruption, reasonably conclude that it could forecast a disruption, or reasonably conclude that this invaded the rights of others? So let me ask you about one of these specific examples, okay? I think arguably, on its face, your position is probably that the strongest comment here was the one that says, and I'm going to paraphrase a little bit here, do you want me to shove my genitals in your face, right? You know what I'm talking about. Oh, yes, yes, I get it, yes. But when I read that comment in the larger context that it was said, which the disciplinary board assumed, it appears that Doe made the statement to compare unwanted sexual conduct, his statement, right, to religious proselytism, and meant to do so in disagreeing with both. Both of these things are a bad thing. So what's your best argument that that statement in its context contributed to this pattern? Well, the context of that statement is that the explanation comes after the statement. So they're talking, and he says, and it's surprising to G.D., she's surprised that he makes this comment about sticking his genitals in her face. She's afraid, she tells the hearing panel about his intent. She is fearful about his intent in that moment. She says, what? He says it again. And then, according to her, he says, oh, I'm saying that's what Jehovah's Witnesses do. Now, Doe later tells the investigator, actually, he doesn't know what the word Jehovah's Witness means. But nonetheless, it's his after-the-fact explanation. So he's made the comment, he's provoked the fear, he's tested. And then when he gets the bad reaction, he says, ah, I have an explanation for why I'm doing this. So yes, the hearing panel assumed that he did not intend, assumed his intent, which under Tinker is not relevant, his intent. Assumed he intended to make a, as he called it, provocative, he says, apt comparison. But they're looking at the effect on the student. And this is unlike some of the other cases, or it's unlike other hypotheticals, where you can imagine that the context had been clarified in advance. There was no warning. It was not, isn't religious proselytization, isn't that forcing their beliefs on somebody almost in a way that you would do, someone could try to force a sexual act on someone. For example, that wasn't it. She says, it was surprising it came out of nowhere. That's what, that's another repeated theme in all of these stories. These statements came out of nowhere. There wasn't that sort of context. There wasn't that understanding that we're having, you know, that this is going to be in the context of the discussion. The explanation came after the fact. So that would be, that's my argument for why it matters. And that's the effect that she told the hearing panel it had on her. And the hearing panel could consider that and credit it in considering the pattern of  There's one factual point I want to address, and it's the timing of the report, the initial reports against Doe. Counsel for Doe said that he caught them drinking. So to be clear, the most people he ever said he saw drinking were CT, complainant CT, complainant JT, a witness RR, and another witness who was interviewed DI. So that still leaves complainants EH, EZ, SK, and witness GD, sorry, the four of them, with no apparent motive to fabricate any story, no motive to discredit Doe for the So even if you were to give credit to that speculative theory, it still only explains less than half of the people that came forward with complaints about Doe. So I'd ask you to affirm the decision below. Thank you, your honors. Thank you, counsel. Will attorney for the appellant please come up and reintroduce yourself on the record. You have a three-minute rebuttal. Thank you. If it pleases the court, counsel for the appellant, Ilya Feoptistov, and counsel for the appellant, John Doe. So I think your honors can sense the tension between trying to fit a round peg into a polygonal hole like this. Because when it comes to things like disruption, you can't just call anything a disruption. A disruption, according to Tinker and circuit cases, must rise to aggressive disruptive action, group demonstrations, threats or acts of violence on school premises, a decline in students' test scores, an upsurge of truancy, or other symptoms of a sick school. This is under Middleborough. Leaving a room, and again, I don't want to diminish the offense or anything like that. Leaving a room is not anything like this kind of disruption. With the rights prong, of course, under Tinker, intent is irrelevant. But under the rights prong, when it comes to violating the rights of others, of course, intent is relevant. When it comes to common law rights that my brother is claiming, such as assault, battery, bodily integrity. And under the right to be left alone, and the gender-based rights, Title IX, et cetera, first of all, the university already agreed that those rights weren't affected by forgoing the Title IX procedure. And second of all, again, intent is a major part of Title IX. It's both objective, yeah, so that there is intent, and there is also objective and subjective reasonableness to the offense taken. It has to be persistent behavior and objectively offensive. So the policy here is almost exactly like the policy in Dijon, where the court said that the use of hostile, offensive, and gender-motivated is, on its face, sufficiently broad and subjective that they could conceivably be applied to cover any speech of a gender-motivated nature and the content of which offends someone. Here, that is the case. And the religious argument is a prime example. Defendants apparently insist on trigger warnings before the use of pathos in an argument. The argument was basically, sorry, they were already discussing Jehovah's Witnesses. They were already in the context of a religious argument. So it didn't come out of the blue this was an argument about religion. The other argument, the other comments were also need to be taken in context. And in general, this case paints a very dystopian picture of the modern campus environment, in my opinion, where almost anything that you say can be punished under some sort of twisting of tinker to where it should never be. Thank you, your honors. Thank you. Thank you, counsel. That concludes arguments in this case.